UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHARLES FOSTER,

       Petitioner,

v.                                                          CASE NO. 6:05-cv-42-Orl-18KRS
                                                            (6:01-cr-198-Orl-18KRS)
UNITED STATES OF AMERICA,

       Respondent.

_____

## ORDER

These cases involve a motion for a new trial pursuant to Federal Rule of Criminal

Procedure 33 (Criminal Case 6:01-cr-198-Orl-18KRS, Doc. No. 107)[1] and a motion to vacate,

set aside, or correct an illegal sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 1) filed by

Charles Foster.  The Government filed a consolidated response to both motions (Doc. No.

20), and Petitioner filed a reply to the consolidated response (Doc. No. 24).  For the

following reasons, the motions are denied.

I.    *Procedural History*

Petitioner was charged in a three-count indictment with one count of possessing

heroin with the intent to distribute and distributing heroin, the use of which resulted in the

death of Aaron Nunez, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. §

_____

[1]Hereinafter, Criminal Case No. 6:01-cr-198-Orl-18KRS will be referred to as
"Criminal Case."

2 (count one); and two counts of possessing heroin with the intent to distribute, in violation

of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (counts two and three) (Criminal Case Doc. No. 20,

filed December 12, 2001). A jury trial was conducted, and Petitioner was found guilty of

all counts (Criminal Case Doc. No. 47). A sentencing hearing was conducted, and although

this Court determined that a life sentence was applicable, Petitioner was sentenced to a

thirty-year term of imprisonment to be followed by three years of supervised release

(Criminal Case Doc. No. 65).

Petitioner filed a direct appeal of his conviction with the Eleventh Circuit Court of

Appeals, which affirmed on August 27, 2003, in a written, unpublished opinion. *See*

Criminal Case Doc. No. 95. Petitioner filed a petition for writ of certiorari with the United

States Supreme Court, which was denied.

## II.    *Rule 33 Motion for New Trial*[2]

Petitioner asserts that he is entitled to a new trial pursuant to Rule 33 based on the

following newly discovered evidence: (1) the February 25, 2001, Tape-Recorded Interview

of Joseph Florit by Detective James Tizzio (Doc. No. 2, Exh. 2) ; (2) the February 28, 2001,

Tape-Recorded Interview of Brett Perry by Detective Kevin Roesner (Doc. No. 2, Exh. 3);

(3) the June 8, 2001, disposal of evidence memorandum written by Detective Kevin Roesner

(Doc. No. 2, Exh. 4); (4) the handwritten notes of Detective Roesner regarding his February

---

[2]Rule 33 provides in pertinent part, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment." Fed. R. Crim. P. 33(a).

27, 2001, interview of Brett Perry (Doc. No. 2, Exh. 3); (5) the handwritten notes of Detective

Roesner regarding his February 28, 2001, interview of Brett Perry (Doc. No. 2, Exh. 3);[3] (6)

the December 4, 2001, supplemental report of Detective Roesner (Doc. No. 2, Exh. 4); (7) a

laboratory report of substances detected in Aaron Nunez (Doc. No. 2, Exh. 4); and (8)

evidence regarding a jailhouse informant.

To establish that a new trial is warranted based on new evidence, a defendant must

show:

> "(1) the evidence [was] discovered following trial; (2) the
> movant [exercised] due diligence to discover the evidence; (3)
> the evidence [is] not . . . merely cumulative or impeaching; (4)
> the evidence [is] material to issues before the court; and (5) the
> evidence [is] of such a nature that a new trial would probably
> produce a new result . . . ."

*United States v. Kersey*, 130 F.3d 1463, 1465 (11th Cir. 1997) (quoting *United States v.*

*DiBernardo*, 880 F.2d 1216, 1224 (11th Cir. 1989)).

   A.   *The February 25 and 28, 2001, Tape-Recorded Interviews; the February 27
        2001, Handwritten Investigation Notes; the June 8, 2001, Memorandum; and
        the Jailhouse Confidential Informant*

With respect to the February 25, 2001, Tape-Recorded Interview of Joseph Florit by

Detective James Tizzio and the February 28, 2001, Tape-Recorded Interview of Brett Perry

by Detective Roesner, the Court concludes that this evidence was available to Petitioner

before the trial. The Government's records indicate that copies of these interviews were

---

[3]Petitioner asserts that the February 27 and 28, 2001, handwritten notes were written by Detective Ron Johnson. Detective Johnson, however, attested that the notes were written by Detective Roesner.

provided to Petitioner's trial counsel. Moreover, Petitioner's trial counsel submitted an affidavit certifying that this evidence was provided him. (Doc. No. 20, Exh. 44.)

Similarly, the Court concludes that Petitioner knew that Aaron Nunez went to an automated teller machine ("ATM") before going with Brett Perry to take heroin on February 25, 2001. At trial, defense counsel attempted to question Detective Ron Johnson concerning whether Mr. Florit told him that Mr. Nunez went to an ATM machine. (Criminal Case Doc. No. 73 at 175-76.) Moreover, defense counsel attests that he was aware of Mr. Nunez's ATM withdrawal. (Doc. No. 20, Exh. 44.) As such, Detective Roesner's June 8, 2001, disposal of the evidence memorandum and the February 28, 2001, handwritten investigation notes referencing the ATM withdrawal and indicating that an ATM receipt was returned to Mr. Nunez's family does not reflect evidence unknown to Petitioner prior to trial.

Petitioner further asserts that he is entitled to a new trial because he discovered after the trial that the Government placed Donald O'Connor in his prison cell in order to obtain information from Petitioner concerning his case. Mr. O'Connor was included on the Government's amended witness list on January 31, 2002. Petitioner maintains that Mr. O'Connor stole and read his legal documents, and as a result, Petitioner was unable to testify at trial. Petitioner contends that his defense counsel told him that the Government planned to call Mr. O'Connor to refute Petitioner's testimony and that he and defense counsel did not understand how Mr. O'Connor obtained his information.

4

The Court concludes that Petitioner has not established that this evidence was unavailable at trial. Petitioner states that he complained to jail officials when he was told that they were instructed to move him to a cell with Mr. O'Connor. (Criminal Case Doc. No. 107 at 16.) Petitioner complained to prison officials about being moved and he knew that Mr. O'Connor "had a reputation as a confidential informant (a/k/a 'Rat'). . . ." *Id.* Despite knowing that jail officials had allegedly been instructed to place Petitioner in a cell with Mr. O'Connor who had a reputation of being a confidential informant, Petitioner never raised this issue during or prior to trial. Moreover, Petitioner did not raise this issue on direct appeal despite allegedly being told about the situation by Robert Abel prior to Petitioner's initial appellate brief being filed. Furthermore, the Court notes that an internal memorandum prepared by the Government on January 30, 2002, for Mr. O'Connor's file indicates that "O'Connor claims to have information on *U.S. v. Charlie Foster* and could testify at that trial <u>but he has not been interviewed</u>." (Doc. No. 20, Exh. 50.) (emphasis added). The memorandum continues, "The Foster information just came to my attention and has not been pursued." *Id.* The Government further indicates that it did not have Petitioner placed in Mr. O'Connor's cell, and Mr. O'Connor attested that there was no arrangement between him and the Government to obtain information regarding Petitioner. (Doc. No. 20, Exh. 55.) Thus, the Court concludes that this evidence is not newly discovered, and alternatively, Petitioner has not established that his allegations regarding these pieces of evidence have merit.

### B.    Laboratory Report

Petitioner contends that after his trial he discovered a toxicology laboratory report from the medical examiner's file on Mr. Nunez, which is different from the laboratory report relied upon by expert witness Dr. Sara H. Irrgang. Dr. Irrgang testified at trial that heroin was the contributing factor in Mr. Nunez's death. The laboratory report submitted by Petitioner differs from the medical examiner's laboratory report admitted at trial in that Petitioner's report indicates that Mr. Nunez had an ethanol level of .181, an increase from .044, and a morphine level of .072, a reduction from .139. Petitioner maintains that the new laboratory report supports his defense that alcohol, and not heroin, was the contributing factor to Mr. Nunez's death.

The Government submitted an affidavit from Dr. Irrgang attesting that the laboratory report used during trial is the one contained in the medical examiner's file and that the laboratory report submitted by Petitioner is false. (Doc. No. 20, Exh. 45.) Moreover, the Government subpoenaed the file of Wuesthoff Laboratories ("Wuesthoff"), which produced the laboratory report used at trial. Wuesthoff provided a sworn statement indicating that the laboratory report it produced is the same as the one admitted at trial and relied upon by Dr. Irrgang. (Doc. No. 20, Exh. 46.) The Court concludes, therefore, that the "new" laboratory report submitted by Petitioner is not reliable and does not constitute new evidence warranting a new trial.

C.     *The February 28, 2001, Handwritten Investigation Notes and December 4, 2001, Supplemental Report of Kevin Roesner*

Petitioner asserts that he is entitled to a new trial based on the February 28, 2001, handwritten notes of Detective Roesner regarding his interviews of Mr. Perry and Detective Roesner's December 4, 2001, Supplemental Report. The February 28, 2001, notes indicate that Mr. Perry told Detective Roesner that he purchased the heroin which killed Mr. Nunez from an individual named "Charlie" at the Red Roof Inn. The February 28, 2001, notes and the December 4, 2001, supplemental report indicate that Mr. Perry described "Charlie" as a six-foot, 35-40 year old, male who had no known tattoos and had dirty blond hair, long enough for a slight pony tail. Petitioner maintains that this description of him does not reflect his actual appearance. Petitioner further asserts that the February 28, 2001, notes and supplemental report indicate that Mr. Perry told police that he bought about 1/4 gram of heroin and paid $55 for one package of heroin wrapped in tin foil, contrary to Mr. Perry's trial testimony that he purchased two 1/4 gram packages of heroin from Petitioner on February 23, 2001, for which he paid $55 a piece for a total of $110.

Petitioner asserts that the Government knowingly elicited testimony that was inconsistent with the handwritten notes and supplemental report and knowingly suppressed this evidence. The Government concedes that it did not give Petitioner Detective Roesner's handwritten notes or the supplemental report because these documents were maintained in the Winter Park Police Department's file and inadvertently were not given to the Government.

7

Under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), a defendant's due process rights are violated when the prosecution knowingly fails to correct a material falsehood in the testimony of any witness. *Id.* This rule covers not only inculpatory false testimony, but also falsehoods tending to enhance the credibility of a witness. *Napue*, 360 U.S. at 269. "[T]he falsehood is deemed to be material 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Additionally, *Brady v. Maryland*, 373 U.S. 83 (1963), "requires the prosecution to turn over to the defense any exculpatory evidence in its possession or control." *See United States v. Jordan*, 316 F.3d 1215, 1226 (11th Cir. 2003). To establish a *Brady* violation, a petitioner must demonstrate the following:

> (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir.), *cert. denied*, 493 U.S. 932 (1989). As the United States Supreme Court has decreed "evidence is 'material' under *Brady,* and the failure to disclose it justifies setting aside a conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the

8

outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110 (1976).

The Court concludes that Petitioner is not entitled to a new trial pursuant to *Giglio* or *Brady*. As an initial matter, this Court notes that Detective Roesner's handwritten notes and supplemental report do not establish that Mr. Perry's trial testimony was false. The February 28, 2001, handwritten notes indicates that Mr. Perry bought about 1/4 gram of heroin for $55, which was used on Saturday, from "Charlie" on Friday, February 23, 2001. (Doc. No. 2, Exh. 3.) The supplemental report provides, "Bret Perry said the heroin that he, Joe Florit, and Aaron Nunez used the previous Saturday was purchased from Charlie for approximately $55." (Doc. No. 2, Exh. 4.) Mr. Perry testified at trial that he bought two 1/4 grams of heroin from Petitioner on February 23, 2001, for $55 a piece for a total of $110. *Id.* at 46-47. Furthermore, Mr. Perry testified that he used all but approximately one dose of one of the 1/4 grams of heroin before meeting Mr. Nunez and Mr. Florit on Saturday. *Id.* at 48-49. Thus, the February 28, 2001, handwritten investigation notes; the December 4, 2001, supplemental report; and Mr. Perry's trial testimony are all consistent, only one of the 1/4 grams of heroin purchased from Petitioner for $55 was used by Mr. Perry, Mr. Nunez, and Mr. Florit.

Furthermore, the Court holds that even if Mr. Perry's testimony that he bought two 1/4 grams of heroin for $55 a piece for a total of $110 was false, it was immaterial under both the *Giglio* and *Brady* standards. Mr. Perry testified that Petitioner was the only person from whom he purchased heroin in February 2001. (Doc. No. 73 at 44-75.) Moreover,

9

Petitioner admitted selling the heroin to Mr. Perry as evidenced by telephone transcripts of conversations between Petitioner and Mr. Perry, which were admitted at trial. *See* Doc. No. 20, Exh. 37 at 3-6. Thus, even if the jury had been made aware of Mr. Perry's statement that he bought one 1/4 gram of heroin from Petitioner, there is not reasonable likliehood that Mr. Perry's purportedly false trial testimony could have affected the judgment of the jury. Similarly, there is no reasonable probability that had Detective Roesner's notes and supplemental report been disclosed to Petitioner the result of the trial would have been different.

Furthermore, the February 28, 2001, handwritten notes mention the Red Roof Inn. (Doc. No. 2, Exh. 3.) Consistent with the notes, Mr. Perry testified that Petitioner stayed at the Red Roof Inn. (Doc. No. 73 at 97.) In the February 28, 2001, handwritten notes and the supplemental report, Mr. Perry identifies "Charlie" as the individual who sold him heroin, describing him as a six-foot, 35-40 years old, male who had no known tattoos and dirty-blond hair, long enough for a slight pony tail. Mr. Perry also indicated that "Charlie" had a girlfriend named Cindy. The record reflects that Petitioner, whose first name is Charles, was 39 years of age at the time of the offense and had a wife named Cynthia. Thus, even if the jury had been made aware of the statements contained in the handwritten notes and supplemental report concerning Mr. Perry's description of Petitioner, there is neither a reasonable likelihood that the allegedly false testimony could have affected the judgment of the jury nor a reasonable probability that the result of the trial would have been different. Accordingly, neither *Giglio* nor *Brady* afford Petitioner any relief.

10

In sum, the Court concludes that much of the evidence offered in support of Petitioner's Rule 33 Motion for a New Trial was not newly discovered after his trial. Furthermore, the evidence submitted by Petitioner is not of such a nature that a new trial would probably produce a different result.  Accordingly, Petitioner's Rule 33 Motion for New Trial is denied.

III.    *Motion to Vacate, Set Aside, or Correct an Illegal Sentence Pursuant to 28 U.S.C. § 2255*

Petitioner alleges three claims: (1) the prosecutor engaged in misconduct; (2) trial counsel rendered ineffective assistance; and (3) Petitioner is actually innocent of possessing heroin with the intent to distribute and distributing heroin, the use of which resulted in the death of Aaron Nunez.  All of Petitioner's claims relate to his conviction and sentence for count one of the indictment.

A.    *Prosecutorial Misconduct*

Petitioner alleges that the Government engaged in prosecutorial misconduct by (1) failing to disclose the evidence on which he relies to support his Rule 33 Motion for New Trial; (2) allowing Mr. Perry to provide perjured testimony; (3) having Petitioner placed in a cell with a confidential informant; (4) suppressing Detective Roesner's handwritten investigation notes from February 28, 2001; (5) allowing Detective Johnson to testify at trial in contradiction to his case notes; and (6) suppressing evidence that Dr. Irrgang had been the subject of two complaints, resulting in investigations concerning autopsies she had performed.

11

As to the first four allegations of prosecutorial misconduct, as discussed in relation to Petitioner's Rule 33 motion, the Court finds that the evidence was (1) provided to Petitioner, (2) does not actually exist, or (3) if it was not provided, the failure to do so did not result in a violation of *Brady* or *Giglio*. As such, the Court concludes that Petitioner is not entitled to relief on the first four allegations of prosecutorial misconduct.

With respect to the trial testimony of Detective Johnson, Petitioner contends that the Government knowingly allowed Detective Johnson to perjure himself. Petitioner contends that Detective Johnson perjured himself by testifying that a telephone call was made from a Wendy's restaurant to Petitioner's cellular telephone on February 23, 2001, thereby implying that the telephone call was made by Mr. Perry to Petitioner to arrange the heroin purchase. Petitioner contends that Detective Roesner's February 28, 2001, notes indicating that Mr. Perry called Petitioner on February 23, 2001, "from a pay phone around Kirkman (Mobile station by McDonalds) near Universal 6:30 pm approx [sic]" would have impeached Detective Johnson's testimony.

During Petitioner's case-in-chief, Detective Johnson was called to testify regarding Petitioner's cellular telephone records. (Criminal Case Doc. No. 74 at 203-06.) Detective Johnson testified that the records indicated that only one telephone call was made from Mr. Perry's apartment to Petitioner's cell phone on March 2, 2001. *Id.* at 205-06. On cross-examination, Detective Johnson testified that a telephone call was made from a Wendy's restaurant to Petitioner's cell phone on February 23, 2001. *Id.* at 207-08. Mr. Perry had

12

previously testified that he thought he met Petitioner on February 23 at a Wendy's or in a Publix parking lot.

Detective Roesner's February 28, 2001, notes would not have impeached Detective Johnson's testimony concerning Petitioner's telephone records. Detective Roesner's February 28, 2001, notes indicate that Mr. Perry called Petitioner from a pay phone around Kirkman near Universal. Detective Johnson testified on redirect that the Wendy's is near Kirkman and Universal. *Id.* at 209. Furthermore, as noted by defense counsel on redirect, Mr. Perry testified that he met Petitioner at Wendy's or in the Publix parking lot. (Criminal Case Doc. No. 73 at 46-47.) Finally, Petitioner asserted at sentencing that he made the February 23, 2001, phone call from Wendy's to his wife who had his cell phone. However, Petitioner failed to call his wife to testify at trial concerning the telephone call from Wendy's. In sum, the Court concludes that Petitioner has not established pursuant to *Giglio* that Detective Johnson's testimony was false such that there is any reasonable likelihood that his allegedly false testimony could have affected the judgment of the jury nor has Petitioner established pursuant to *Brady* that had Petitioner been provided with Detective Roesner's February 28, 2001, notes that a reasonable probability exists that the result of the trial would have been different. Accordingly, this allegation of prosecutorial misconduct does not warrant relief.

Finally, Petitioner asserts that the Government violated *Brady* by suppressing evidence that Dr. Irrgang had been investigated in 1995 and 2002 concerning two of her autopsy findings. In support of his allegation concerning the 1995 investigation, Petitioner

references a newspaper article from April 30, 2000. *See* Doc. No. 1 at 18. Thus, information

concerning the alleged 1995 investigation was available to Petitioner at the time of his trial

in February 2002.   Furthermore, in support of his argument concerning the alleged 2002

investigation, Petitioner relies on a newspaper article from August 31, 2003. *See id.* The

article indicates that the alleged investigation related to an autoposy performed by Dr.

Irrgang in January 2002, resulting in a nineteen-month investigation. *See* Doc. No. 24, Exh.

2 at 47-48.   Thus, the 2002 investigation was not complete for more than a year after

Petitioner's trial concluded.   Petitioner has not established that the Government engaged

in prosecutorial misconduct by allegedly suppressing evidence concerning the alleged

investigations of Dr. Irrgang because the information regarding the 1995 investigation was

available to Petitioner prior to trial and information regarding the 2002 investigation was

not available until after Petitioner's trial. *See United States v. Meros*, 866 F.2d 1304 (11th Cir.

1984) (holding in part that *Brady* is not violated when the defendant could obtain the

information himself with reasonable diligence).   Moreover, Petitioner has not established

that had this evidence been disclosed that a reasonable probability exists the trial would

have been different.   Accordingly, this claim is without merit.

### B.   *Ineffective Assistance of Counsel*

Petitioner contends that trial counsel rendered ineffective assistance of counsel by

(1) failing to investigate; (2) failing to present defenses and impeach witnesses; (3) failing

to call witnesses; (4) failing to raise or explore jury tampering; and (5) precluding Petitioner

from testifying.

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[4] *Id.* at 687-88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir.), *cert. denied*, 493 U.S. 945 (1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

---

[4]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted), *cert. denied*, 514 U.S. 1131 (1995).   Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

### i.     *Failure to Investigate, Present Defenses, and Impeach Witnesses*

Petitioner contends that trial counsel failed to investigate because he did not obtain (1) the February 25, 2001, Tape-Recorded Interview of Joseph Florit by Detective James Tizzio; (2) the February 28, 2001, Tape-Recorded Interview of Brett Perry by Detective Kevin Roesner; (3) the June 8, 2001, disposal of evidence memorandum written by Detective Kevin Roesner; (4) the handwritten notes of Detective Roesner of his February 27, 2001, interview of Brett Perry; (5) the handwritten notes of Detective Roesner of his February 28, 2001, interview of Brett Perry; (6) the December 4, 2001, supplemental report of Detective Roesner; (7) a toxicology laboratory report of substances detected in Mr. Nunez's body; and (8) evidence related to the 1995 and 2002 investigations of Dr. Irrgang. Petitioner further asserts that trial counsel failed to present defenses and impeach witnesses based on this evidence.

Petitioner contends that had counsel investigated and obtained this evidence, he would have been able to impeach Mr. Perry, Dr. Irrgang, and Detective Johnson and he would have been able to introduce a defense that the heroin which Mr. Nunez used was purchased on February 27, 2001, from someone other than Petitioner.

16

First, as discussed *supra,* the Court finds that the February 25, 2001, Tape-Recorded Interview of Joseph Florit by Detective James Tizzio and the February 28, 2001, Tape-Recorded Interview of Brett Perry by Detective Kevin Roesner were provided to Petitioner's counsel. Petitioner's defense counsel hired an investigator to interview Mr. Florit as a result. Likewise, defense counsel was aware of Mr. Nunez's ATM withdrawal. Furthermore, the medical examiner's file concerning Mr. Nunez did not contain the laboratory report Petitioner submitted in support of the instant motions. Thus, trial counsel did not render deficient performance by failing to obtain or investigate this evidence.

Moreover, even assuming that trial counsel failed to investigate and obtain this evidence, the Court concludes that Petitioner has not established that he was prejudiced by counsel's failure to do so. Mr. Florit's interview statement that Mr. Nunez's eyes were bleeding and one was hanging off of his face would not have established that Mr. Nunez died from a head trauma. None of the witnesses interviewed indicated that Mr. Nunez was involved in any type of altercation resulting in a head injury. Moreover, Dr. Irrgang's autoposy findings indicate that there were "[m]ultiple petechiae of the eyes. . . ." (Doc. No. 2, Exh. 5.) "Petechiae" is defined as "a minute reddish or purplish spot containing blood that appears in skin or mucous membrane as a result of localized hemorrhage." *See* www.mirriamwebster.com. Despite the multiple petechiae of the eyes, Dr. Irrgang testified that the contributing cause of death was the level of heroin in Mr. Nunez's body.

17

Additionally, Mr. Florit's interview detailing the incident indicates that there was no purchase of heroin on the night/morning of the incident, but instead that the heroin was provided to them by Mr. Perry. Mr. Perry testified that he purchased the heroin from Petitioner on February 23, 2001, prior to the incident. Thus, evidence concerning Mr. Nunez's ATM withdrawal would not have resulted in a different outcome.

Furthermore, as discussed *supra*, Mr. Perry's testimony concerning how much heroin he purchased from Petitioner would not have been impeached by Detective Roesner's handwritten notes or supplemental report. Instead, consistent with Mr. Perry's trial testimony that he purchased two 1/4 grams of heroin from Petitioner, one of which Mr. Perry used before the incident, the handwritten notes and supplemental report indicate that Mr. Perry purchased 1/4 gram of heroin for $55 from Petitioner which was used by Mr. Perry, Mr. Florit, and Mr. Nunez. Moreover, the handwritten notes and supplemental report establish that Mr. Perry named Petitioner as the person who sold him the heroin just as Mr. Perry testified at trial. Finally, Mr. Perry testified that Petitioner was the only person from whom he purchased heroin in February 2001, and Petitioner admitted that he sold Mr. Perry the heroin as evidenced by the transcripts of the telephone conversations between Mr. Perry and Petitioner.

Finally, trial counsel's failure to investigate the 1995 and 2002 investigation of Dr. Irrgang and his failure to attempt to impeach Dr. Irrgang based on the investigations did not prejudice Petitioner. Neither of the autopsies involved in the 1995 or 2002 investigations involved heroin. As such, their admissibility to impeach Dr. Irrgang is

18

questionable.  *See* Fed. R. Evid. 608(b).  Also, the toxicology lab report supports Dr.

Irrgang's testimony that Mr. Nunez's death was the result of heroin ingestion.  Moreover,

trial counsel effectively cross-examined Dr. Irrgang and introduced an expert to refute Dr.

Irrgang's testimony.  In sum, the Court concludes that Petitioner was not prejudiced by

trial counsel's alleged failure to obtain or investigate this evidence nor was he prejudiced

by trial counsel's failure to use such evidence.

### ii.    *Failure to Call Witnesses*

Petitioner contends trial counsel was ineffective for failing to call Detective Roesner,

Mr. Florit, and Fawn Trivette as witnesses.  Petitioner maintains that Detective Roesner and

Mr. Florit could have testified concerning Mr. Nunez's ATM withdrawal, thereby

supporting Petitioner's theory that the heroin was purchased from someone else.

Petitioner further asserts that Ms. Trivette told him that she sold Mr. Perry the heroin that

killed Mr. Nunez.

With respect to Detective Roesner and Mr. Florit, the Court concludes that Petitioner

was not prejudiced by trial counsel's failure to call these witnesses.  There is no evidence

that Mr. Perry, Mr. Florit, or Mr. Nunez purchased heroin on the night/morning of the

incident.  Instead, Mr. Perry testified that he purchased the heroin from Petitioner on

February 23, 2001, approximately two days before Mr. Nunez died.  Furthermore,

Petitioner admitted that he sold the heroin to Mr. Perry as evidenced by the transcripts of

the telephone conversations between Mr. Perry and Petitioner after Mr. Nunez's death.

Thus, Petitioner has not established that a reasonable probability exists that the outcome

of the proceeding would have been different had testimony regarding Mr. Nunez's ATM withdrawal been admitted.

Petitioner contends that Ms. Trivette told him that she sold Mr. Perry heroin from February 23 through 25, 2001, and that she sold Mr. Perry heroin hours before Mr. Nunez's overdose. Petitioner maintains that he told trial counsel about Ms. Trivette, yet he failed to call her to testify.

"[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *Daniels v. McDonough,* 2006 WL 2620143, at *10 (M.D. Fla. 2006) (quoting *United States v. Ashimi,* 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted)). As such, "to successfully assert that trial counsel should have called a witness, a petitioner must first make a sufficient factual showing substantiating the proposed witness testimony." *Daniels,* 2006 WL 2620143, at *10 (citing *United States v. Schaflander,* 743 F.2d 714, 721 (9th Cir. 1984)). Evidence sufficient to meet this showing includes sworn affidavits from the potential witnesses stating what testimony they would have provided. *Daniels,* 2006 WL 2620143, at *10. "In the absence of the necessary factual showing, Petitioner's mere conclusory allegations are insufficient to warrant finding that trial counsel was ineffective for failing to call these witnesses to testify." *Id.* (citation omitted).

In the instant case, Petitioner failed to provide any evidence substantiating what

20

testimony Ms. Trivette would have provided had she been called to testify.[5]  Thus,
Petitioner's conclusory allegation that Ms. Trivette would have testified that she sold Mr.
Perry the heroin does not support a finding of ineffective assistance of counsel.  Moreover,
Ms. Trivette was included on the Government's witness list.  As evidenced by the
Government's motion to recognize Ms. Trivette's substantial assistance filed in an
unrelated criminal case, Ms. Trivette was prepared to testify in rebuttal to Petitioner's
anticipated testimony that she was the supplier of the heroin in question.  *See* Criminal
Case 6:01-cr-170-Orl-28DAB, Doc. No. 76.  Finally, trial counsel attests that Petitioner never
told him about Ms. Trivette's purported confession.  Accordingly, the Court concludes that
Petitioner has not established that he was prejudiced by trial counsel's failure to call these
witnesses.

### iii.   Jury Tampering

Petitioner asserts that trial counsel rendered ineffective assistance by failing to raise
or explore the issue of jury tampering.  At trial, the prosecutor notified the Court that he
saw Mr. Nunez's father sitting with some jurors at lunch.  Petitioner contends that trial
counsel failed to ascertain whether Mr. Nunez's contact with the jury was harmless.

"Once a defendant establishes that the jury had an extrinsic contact, the burden
shifts to the government to demonstrate that the consideration of the extrinsic evidence
was harmless."  *United States v. Pessefall*, 27 F.3d 511, 515 (11th Cir. 1994).  The record

---

[5]The Court notes that Ms. Trivette died in July of 2005.  Thus, she is not available to
either confirm or refute Petitioner's allegations.

21

reflects that Mr. Nunez's father told the prosecution that he was unaware that the individuals with whom he sat were jurors, that the jurors did not discuss the case at lunch, and that he did not speak to the jurors. (Criminal Case Doc. No. 73 at 62-63.) Petitioner's counsel then asked the Court to confirm from Mr. Nunez whether or not the prosecutor's statements were true. *Id.* The Court questioned Mr. Nunez, and he responded affirmatively. *Id.* Mr. Nunez further attests that he did not speak with the jurors. (Doc. No. 38, Exh. 2.)

Petitioner's allegations are speculative and inadequate as a matter of law to raise a cognizable claim of ineffective assistance of counsel. Petitioner has not provided any evidence that the contact between the jury members and Mr. Nunez's father affected the proceedings. *See Barkauskas v. Lane*, 946 F.2d 1292, 1295 (7th Cir. 1991); *cf. Aldrich v. Wainwright*, 777 F.2d 630, 637 (11th Cir. 1985), *cert. denied*, 479 U.S. 918 (1986) (speculation insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation). Furthermore, trial counsel had the Court question Mr. Nunez and was satisfied with his response. Thus, there is no indication that jury tampering occurred. Accordingly, the Court concludes that Petitioner has not established that trial counsel was ineffective by failing to raise or pursue the claim of jury tampering.

### iv.   *Failure to Testify*

Petitioner maintains that trial counsel prevented him from testifying by threatening to withdraw from the case if he did so. Trial counsel attests that he did not threaten to

withdraw if Petitioner testified, that Petitioner chose not to testify because of his prior record, and that Petitioner made the decision not to testify freely and voluntarily.

The Court concludes that even if trial counsel prevented Petitioner from testifying, Petitioner has not established that he was prejudiced by counsel's performance. Petitioner contends he would have testified that Ms. Trivette told him that she sold Mr. Perry the heroin involved in Mr. Nunez's death. The defense's theory developed at trial was that someone other than Petitioner sold the heroin to Mr. Perry. Mr. Perry, however, testified that Petitioner sold him the heroin and that Petitioner was the only person from whom he purchased heroin in February 2001. Had Petitioner testified, the Government would have been allowed to raise Petitioner's prior record. Moreover, Petitioner's testimony would have been impeached by Petitioner's admissions in the telephone conversations between him and Mr. Perry after Mr. Nunez's death wherein he admitted that he sold Mr. Perry the heroin. Finally, the Government, which listed Ms. Trivette as a potential trial witness, would have been allowed to call her to testify in rebuttal to Petitioner's testimony. As such, a reasonable probability does not exist that the outcome of the proceedings would have been different had Petitioner testified.

## C.    *Actual Innocence*

Petitioner contends that he is actually innocent of count one. He maintains that newly discovered that was allegedly suppressed by the Government establishes his innocence.

23

Federal habeas relief is designed to rectify constitutional violations, rather than factual errors. A claim of actual innocence based upon newly discovered evidence is not cognizable in a federal habeas corpus proceeding. *See Townsend v. Sain*, 372 U.S. 293 (1963) ("[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not ground for relief on federal habeas corpus."); *Drake v. Francis*, 727 F.2d 990, 993 (11th Cir. 1984) ("In order for a claim of newly discovered evidence to justify habeas review, the evidence must bear on the constitutionality of the defendant's conviction.").

Petitioner's claim of actual innocence is based on his claims of prosecutorial misconduct and ineffective assistance of counsel, which have already been rejected by this Court. Moreover, the Court concludes that Petitioner has failed to provide any evidence establishing that he is actually innocent of possessing heroin with the intent to distribute and distributing heroin, the use of which resulted in Aaron Nunez's death. This claim, therefore, must be denied.

IV.   *Conclusion*

Any of Petitioner's allegations that are not specifically addressed herein have been found to be without merit.

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.      Petitioner's Motion for New Trial (Criminal Case 6:01-cr-198-Orl-18KRS, Doc. No. 107) is **DENIED**.

2.      The motion to vacate, set aside, or correct an illegal sentence pursuant to 28

24

U.S.C. § 2255 (Doc. No. 1) filed by Charles Foster is **DENIED**, and this case is **DISMISSED** with prejudice.

3.      The Clerk of the Court shall enter judgment in Case Number 6:05-cv-42-Orl-18KRS and is directed to close this case.

4.      The Clerk of the Court is directed to file a certified copy of this Order in criminal case number 6:01-cr-198-Orl-18KRS and to terminate the motion to vacate, set aside, or correct an illegal sentence pursuant to 28 U.S.C. § 2255 (Criminal Case 6:01-cr-198-Orl-18KRS, Doc. No. 112) and the motion for new trial (Criminal Case 6:01-cr-198-Orl-18KRS, Doc. No. 107) pending in that case.

**DONE AND ORDERED** at Orlando, Florida, this ___7___ day of June, 2007.


                                    _____
                                    G. KENDALL SHARP
                                    SENIOR UNITED STATES DISTRICT JUDGE

Copies to:
sc 6/6
Charles Foster
Counsel of Record

25